**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0067-22

MARIA PERDOMO,

    Plaintiff-Appellant,

v.

SNOWLIFT, LLC,

    Defendant-Respondent,

and

PORT AUTHORITY OF NEW
YORK AND NEW JERSEY,

    Defendant.

_____

        Argued January 16, 2024 – Decided April 10, 2024

        Before Judges Gilson and Bishop-Thompson.

        On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-1749-18.

        Maurice J. Donovan argued the cause for appellant (Law Office of Barbosa Donovan, attorneys; Marilyn K. Barbosa and Maurice J Donovan, of counsel and on the briefs).

Jennifer Huang (KMA Zuckert LLC) argued the cause for respondent (Jennifer Huang and Nicholas E. Pantelopoulos, attorneys; Jennifer Huang and Nicholas E. Pantelopoulos, of counsel and on the brief).

PER CURIAM

In this personal injury action, plaintiff Maria Perdomo appeals from a July 29, 2022 order granting summary judgment in favor of defendant Snowlift, LLC (Snowlift), the contractor hired by United Airlines (United) to perform snow removal and clearance services at Newark Liberty International Airport (EWR). We affirm.

I.

We discern the following facts from the motion record construed in the light most favorable to Perdomo as the non-moving party. See Templo Fuente De Vida Corp. v. Nat. Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016). The Port Authority leases Terminal C at EWR to United. Under the lease agreement, United is responsible for snow removal and clearance at United's terminals.

United retained Snowlift to provide snow removal and clearance services from the aircraft gate position areas, the ramp, and the apron areas. The Agreement defines snow clearance as the "pushing and piling of accumulated

snow" and snow removal as "either the hauling away of snow or loading of snow melters and the operation thereof."  As to the scope of services, Snowlift agreed to perform snow clearance services "on a continuous twenty-four hours per day and seven days per week basis during the [s]now [s]eason," and push and plow snow until all accumulations were put into piles at the designated locations as set forth in the addendum to the Agreement.  Snowlift also agreed to perform snow removal service from the designated United areas using an ice melter upon United's request.  Further, Snowlift would continue to perform the snow removal service until all snow accumulations placed in piles has melted and drained excepting any piles United chooses to leave for natural melting.  Both services required United's written authorization for the satisfactory completion of services and Snowlift's release from the performance of its contractual services.

Pursuant to section 5.7.3 of the Agreement, Snowlift was precluded from performing any services for which there would be an additional charge or was the responsibility of another supplier without prior written authorization from United.  In that regard, Snowlift was only to "perform ice control on any pavement when requested in writing by United."  The Agreement defined ice control as "the spreading of material such as sodium acetate/formate, potassium, acetate, sand[,] and salt."

A-0067-22

Section 5.6 of the Agreement also stated that Snowlift "shall provide [s]now [r]emoval [s]ervices and [s]now [c]learance [s]ervices in a manner that provides a clean and safe environment for the employees and guests that use the areas from which snow is removed." Section 5.7 provided Snowlift "shall check the condition and performance and make adjustments to the schedule and snow removal [and] clearance program to ensure that facilities meet the performance standards" of United.

Beginning March 13, 2017, at 4:00 a.m. and ending at 8:45 p.m. on March 17, Snowlift performed snow removal and snow clearance services, as approved by United, at Terminal C during a nor'easter that brought blizzard conditions over portions of New Jersey although EWR remained open. Joseph Ferrucci, a vice president at Snowlift, testified that Snowlift did not perform snow or ice abatement. Snowlift "pushed or piled" snow out from the left side of concourse C-3, gates 130 through 136, toward the designated piling area near gate 130. At United's request, Snowlift also removed the snow near gate 130 for melting by using a 150-ton melter. Also at United's request, beginning March 14 at 5:00 a.m. and ending the next day at 3:00 p.m., Snowlift used a pay loader to scrape the snow off the ground "because the temperature was cold" and to make sure any snow residue was removed. After Snowlift's services were completed, a

4

United representative signed the work authorization, indicating the inspection and approval of Snowlift's removal and clearance services. According to Ferrucci, Snowlift did not provide any spreading materials to the Terminal C because "[t]ypically, United provided the application of melting materials at their own gates at the terminal."

Perdomo testified that she was employed as a United ramp supervisor. According to Perdomo, at approximately 1:00 a.m. on March 15, she was driving a vehicle on the airport ramp transporting United employees to Terminal C, concourse C-3 between Gates 134 and 136 to prepare the necessary ground equipment and ensure the baggage tug was operational for an inbound flight. Perdomo located the airport tug, stopped, and exited the vehicle. While walking on the ramp at gate 134, she slipped and fell on "black ice," resulting in injuries. During her deposition, Perdomo described the ramp as "snowier" and "icier" than the areas shown in photographs taken of gates 105 or 107 at concourse C-2 at 9:00 p.m., the night before her fall. Perdomo testified that at the time of the incident, there were no snow removal trucks or equipment in the area because the snow had been removed by Snowlift.

In March 2018, Perdomo filed her complaint against Snowlift, asserting that her trip and fall was caused by Snowlift's negligence in the "maintenance,

A-0067-22

abatement, removal[,] and remediation of snow and ice on the tarmac of Terminal C." The next day, Perdomo amended her complaint, adding the Port Authority of New York and New Jersey (Port Authority) as a defendant.

In support of its motion for summary judgment, Snowlift provided the certification of Thomas Kerrigan, a United senior manager for ground equipment maintenance at EWR. Kerrigan certified that in March 2017, he was employed as United's ramp service supervisor for Terminal C. In that regard, Kerrigan's responsibilities included "coordinating and overseeing United's snow and ice removal activities on the ramp or the secure side of the terminal building." He stated United hired Snowlift to remove snow from the ramp area where plaintiff "allegedly fell." Kerrigan further certified that United did not give Snowlift written authorization to perform ice remediation or control.

Fred Burns was Snowlift's lead supervisor during the nor'easter. He testified that Snowlift performed snow removal and clearance services for gates 134 to 136 between 4:30 a.m. on March 13 and 3:30 p.m. on March 14. Burns stated the services rendered by Snowlift did not include any pre-ice spreading or any application during this nor'easter. He further testified that Snowlift was "never involved" in any kind of ice spraying of any chemical at Terminal C during any storm.

6

In opposing Snowlift's motion, plaintiff relied on the incident report prepared by Port Authority police officer Leonard Hoffman. The report stated Hoffman was told that as Perdomo was walking on the ramp; she lost traction on the "slippery ground," fell backwards, and hit her head on the ground. Hoffman interviewed employees gathered around the gate; none saw Perdomo fall. He observed the condition of the "floor" as "[i]cy, [s]nowy, and very slippery due to the recent snowstorm." Hoffman initially testified that the ground was "wet, icy, [and] slushy" but there was no snow where Perdomo fell. He later clarified his testimony, stating that "[it] wasn't like mounds of snow . . . it was more turning to, like, slush, and which was really turning to ice . . . ."

Perdomo also relied on the expert report prepared by Matthew D. Lykins, who was retained to investigate and determine whether Snowlift caused or contributed to Perdomo's injury. The Lykins report, dated September 13, 2021, stated that Perdomo fell as she walked from a vehicle to an aircraft tug near gate 134 in the C-3 concourse when she fell on the "icy tarmac." Lykins reviewed the discovery produced by the parties and the photographs taken by him on his tour of the C-3 ramp near gates 130 to 136 on July 16, 2021. In forming his opinion, Lykins relied on photographs taken "around the time of plaintiff's fall representing a photographic description of the ramp conditions;" however, we

7

are unable to discern from the report whether the photographs were of the C-3 ramp.[1] Based on Lykins review of the discovery and the federal aviation regulations, he concluded that the combination of the "hazard and exposure" of the icy ramp created an unreasonably dangerous condition that caused or contributed to Perdomo's fall. Lykins further opined that Snowlift failed to meet the safety standards under section 5.7 of the Agreement by failing to: (1) adequately inspect the ramp after performing snow clearance near gate 134; and (2) identify the hazard of the icy ramp while performing snow clearance. Snowlift failed to meet its contractual obligation and notify United of the hazard of the icy surface conditions while performing snow clearance. Lastly, Snowlift failed to comply with 14 CFR Part 139.313(b)(1)[2] to "remove as completely as practical" snow, ice, and slush from the ramp.

---

[1] Presumably, these are the same photographs identified by Perdomo as gates 105 or 107 at concourse C-2 taken at 9:00 p.m. the night before her fall.

[2] 14 CFR Part 139.313(b)(1) governs ice and snow control plans at airport. The provision states: "The snow and ice control plan required by this section must include, at a minimum, instructions[,] and procedures for [p]rompt removal or control, as completely as practical, of snow, ice, and slush on each movement area." 14 CFR Part 139.5 defines certification holder as an airport operating certificate for operation of a class I, II, III, or IV airport. See Certification of Airports 69 Fed. Reg. 6425 (Feb. 10, 2004).

A-0067-22

After the close of discovery, the Port Authority moved for, and was granted summary judgment, which was not appealed. Snowlift also moved for, and was granted summary judgment, which is the basis for this appeal.

On July 29, 2022, the trial court rendered an oral decision and entered an order dismissing Perdomo's complaint with prejudice. In granting summary judgment, the trial court concluded Perdomo did not establish that Snowlift failed to perform its contractual obligation as set forth in the Agreement with United. In rejecting Perdomo's argument that Snowlift was obligated to reinspect areas where snow had been cleared or removed, the court explained that Snowlift's obligation to Perdomo "beg[an] and flow[ed] with the contract." The court found that it was undisputed that Snowlift cleared the snow to the area designated by the Agreement and Snowlift's completed work was "signed off" by United. The court found there were no disputed facts in the record that Snowlift failed to follow the terms of the Agreement. The court further found that de-icing of the area was in the "control" of United and the federal regulation relied upon by Perdomo's expert applied to United as the certificate holder and not to Snowlift. Therefore, based on the language in the Agreement, Snowlift was not required to take any further action or reinspection, and no duty extended to Perdomo.

A-0067-22

II.

On appeal, Perdomo presents the following arguments for our consideration:

POINT I

SUMMARY JUDGMENT WAS IMPROVIDENTLY GRANTED BECAUSE PERDOMO ADVANCED A VIABLE NEGLIGENCE CAUSE OF ACTION AGAINST SNOWLIFT.

POINT II

SNOWLIFT BREACHED ITS WELL-ESTABLISHED DUTY TO PERDOMO TO PERFORM ITS SNOW REMOVAL WORK IN A REASONABLY SAFE AND NON-NEGLIGENT MANNER.

POINT III

THERE ARE OTHER EXPRESS DUTIES UNDER THE CONTRACT WHICH SNOWLIFT BREACHED RESUL[T]ING IN [PERDOMO'S] FALL.

POINT IV

THE FACTUAL RECORD CONFIRMS SNOWLIFT HAD NOT LEFT THE AREA OF THE FALL AND WAS STILL WORKING AT THE TIME OF THE FALL.

POINT V

SNOWLIFT WAS RESPONSIBLE FOR ICE CONTROL PURSUANT TO THEIR CONTRACT WITH UNITED.

A-0067-22

We review a grant or denial of summary judgment de novo, "applying the same standard used by the trial court." Samolyk v. Berthe, 251 N.J. 73, 78 (2022). Based on that standard, we are required to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the trial court's legal analysis or statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

"An issue of material fact is 'genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would

require submission of the issue to the trier of fact.'" Grande v. St. Clare's Health Sys., 230 N.J. 1, 24 (2017) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).

In a negligence action, a plaintiff bears the burden of proving defendant: (1) owed a duty of care; (2) breached that duty; (3) proximately caused the plaintiff's injuries; and (4) caused actual damages. Shields v. Ramslee Motors, 240 N.J. 479, 487 (2020) (quoting Robinson v. Vivirito, 217 N.J. 199, 208 (2014)). "'The question of whether a duty exists is a matter of law properly decided by the court, not the jury.'" Carter Lincoln-Mercury, Inc. v. EMAR Group, Inc., 135 N.J. 182, 194 (1994) (internal citation omitted).

In the context of a snowstorm, our Supreme Court adopted the ongoing storm rule in Pareja v. Princeton International Properties, holding "commercial landowners do not have a duty to remove the accumulation of snow and ice until the conclusion of the storm, but unusual circumstances may give rise to a duty before then." 246 N.J. 546, 558 (2021). Generally, the determination of a duty is considered "a matter of law properly decided by the court." Wang v. Allstate Ins. Co., 125 N.J. 2, 15 (1991).

Perdomo contends Snowlift failed to exercise proper and reasonable care in the snow removal services during the nor'easter. She further contends the trial court focused exclusively on Snowlift's legal duty but erred in finding that

the legal duty was limited by the Agreement between Snowlift and United, resulting in an "artificial and inordinately limited interpretation" of the Agreement. We reject Perdomo's contentions.

Based upon our de novo review, we discern no error of law. At the outset, we note Pareja is not applicable to these facts. Perdomo has presented no evidence to establish the snow removal and clearance was done in a manner that caused or increased the risk of harm to her. Here, the parties do not dispute that Snowlift was called to EWR to perform snow removal and clearance services at United's Terminal C. The record shows Snowlift performed the contracted services for snow removal and clearance at gates 134 to 136 to United's satisfaction. The Agreement expressly provided that the control of ice abatement or remediation was in the "control" of United. It is also undisputed that United did not delegate the exercise of its control of ice abatement or remediation by written request to Snowlift to perform ice abatement or remediation for the 2017 nor'easter. Therefore, we agree with the trial court's holding that Snowlift did not owe a contractual duty to Perdomo. Therefore, summary judgment was properly granted in the absence of any genuine issue of material fact.

A-0067-22

To the extent we have not expressly addressed any of Perdomo's remaining arguments, we find they are without sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0067-22